# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

| | | |
|---|---|---|
| CINCINNATI DEVELOPMENT 1, LLC, | : | Case No. 1:19-cv-320 |
| | : | Judge Timothy S. Black |
| Plaintiff, | : | |
| vs. | : | |
| ABM INDUSTRY GROUPS, LLC, | : | |
| Defendant. | : | |

### ORDER GRANTING DEFENDANT'S MOTION
### FOR PARTIAL JUDGMENT ON THE PLEADINGS (Doc. 10)
### AND DENYING PLAINTIFF'S CROSS-MOTION
### FOR PARTIAL JUDGMENT ON THE PLEADINGS (Doc. 12)

This civil case is before the Court on Defendant ABM Industry Groups, LLC ("ABM")'s motion for judgment on the pleadings (Doc. 10) and Plaintiff Cincinnati Development 1, LLC ("CD1")'s cross-motion for judgment on the pleadings (Doc. 12), as well as the parties' responsive memoranda (Docs. 11, 13, 14).

## I.    BACKGROUND

This matter arises out of a contract dispute between CD1, a parking garage owner, and ABM, a parking garage manager. On August 31, 2014, CD1 entered into a Parking Garage Lease Agreement ("Lease Agreement") with ABM. (Doc. 1 at ¶ 6). The Lease Agreement established an arrangement whereby ABM would install its equipment and operate the parking garage owned by CD1. (*Id.* at ¶ 8). Under the terms of the Lease Agreement, ABM was required to pay a monthly "base rent" of $62,500, as well as additional "percentage rent" consisting of 85% of the gross parking receipts collected

each lease year in excess of $1,000,000. (*Id.* at ¶¶ 10, 20). The initial term of the Lease Agreement was seven years, with each "lease year" running from September 1 through August 31. (*Id.* at ¶ 11). The Lease Agreement afforded CD1 an early termination right with thirty days' written notice. (*Id.* at ¶ 12). As a result of ABM's alleged poor management and failure to properly calculate and/or report parking receipts, CD1 decided to exercise its right to terminate the contract prematurely, giving ABM notice on January 24, 2019 that the termination date of the lease would be February 28, 2019. (*Id.* at ¶¶ 14-17).

The core of this dispute is whether ABM owes CD1 percentage rent that accrued from the beginning of the last lease year, September 1, 2018, through the early termination date of February 28, 2019. CD1 seeks percentage rent in the amount of $277,814.87, which it estimates by subtracting $83,333.33 (the $1,000,000 annual threshold divided by twelve) from the monthly gross parking receipts.[1]

| Month | Gross Prkng. Rcpt. | Threshold | Monthly Excess | Monthly % Rent (85 pcnt) |
|---|---|---|---|---|
| Sept. '18 | $ 134,557.00 | $ 83,333.33 | $ 51,223.67 | $ 43,540.12 |
| Oct. '18 | $ 138,559.00 | $ 83,333.33 | $ 55,225.67 | $ 46,941.82 |
| Nov. '18 | $ 139,776.00 | $ 83,333.33 | $ 56,442.67 | $ 47,976.27 |
| Dec. '18 | $ 145,996.00 | $ 83,333.33 | $ 62,662.67 | $ 53,263.27 |
| Jan. '19 | $ 137,953.00 | $ 83,333.33 | $ 54,619.67 | $ 46,426.72 |
| Feb. '19 | $ 130,000.00[1] | $ 83,333.33 | $ 46,666.67 | $ 39,666.67 |
| **TOTAL PERCENTAGE RENT OWED CD1** | | | | **$277,814.87** |

---

[1] Plaintiff clarifies in its briefing on its cross-motion for judgment on the pleadings that the actual amount of gross parking receipts for September 2018 through February 2019 is unknown, because Plaintiff estimated the receipts for February and doubts the veracity of ABM's sales statements. (*See* Doc. 12 at 6 n.4).

(Doc. 4 at 5). On February 26, 2019, CD1 issued a written correspondence to ABM demanding payment of the percentage rent accruing from September 1, 2018 through February 2019. (*Id.* at ¶ 18). ABM has refused to pay the demanded amount.

CD1 initiated this lawsuit seeking an award of $277,814.87 in percentage rent, asserting the following claims: action on account (Count 1), breach of contract (Count 2), a demand for an accounting (Count 4), and unjust enrichment and equitable disgorgement (Count 5). (*Id.* at 6-10). In addition, in Count 3, Plaintiff seeks a declaration that (a) the Lease Agreement is a valid enforceable contract, (b) Section 3(b) of the Lease Agreement discussing percentage rent has a latent ambiguity under the circumstances of early termination, and that (c) the terms of Section 3(b) should be construed to require payment of percentage rent for the period of September 2018 through February 2019 by ABM to CD1. (*Id.* at ¶¶ 59-64).

Defendant filed a motion for judgment on the pleadings as to Count 3, asking the Court to reject Plaintiff's request for a declaration that the Lease Agreement contains a "latent" ambiguity and to instead declare that ABM does not owe any amount of percentage rent to CD1. (Doc. 10 at 1, 4). Defendant also seeks dismissal of Count 1 (action on account), Count 2 (breach of contract), and Count 5 (unjust enrichment/ equitable disgorgement), which it alleges are dependent on a finding that the contract is ambiguous. (*Id.*).

In response, Plaintiff filed a cross-motion for partial judgment on the pleadings with respect to Count 3, seeking a declaration that the Lease Agreement contains a latent ambiguity and that ABM owes percentage rent accrued from September 2018 to February

2019. (Doc. 12 at 7). For the reasons stated below, the Court grants Defendant's motion for partial judgment on the pleadings and denies Plaintiff's cross-motion for partial judgment on the pleadings.

## II. STANDARD OF REVIEW

The standard of review for a Rule 12(c) motion is the same as that for a motion under Rule 12(b)(6) for failure to state a claim upon which relief can be granted. *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010). "For purposes of a motion for judgment on the pleadings, all well-pleaded material allegations of the pleadings of the opposing party must be taken as true, and the motion may be granted only if the moving party is nevertheless clearly entitled to judgment." *Id.* (citing *JPMorgan Chase Bank, N.A. v. Winget*, 510 F.3d 577, 581 (6th Cir. 2007)). That is, a court should grant a motion for judgment on the pleadings under Rule 12(c) only if "no material issue of fact exists and the party making the motion is entitled to judgment as a matter of law." *Winget*, 510 F.3d at 582 (quoting *Paskvan v. City of Cleveland Civil Serv. Comm'n*, 946 F.2d 1233, 1235 (6th Cir. 1991)).

## III. ANALYSIS

Defendant argues that under the plain language of the Lease Agreement, ABM does not owe percentage rent both because gross parking receipts had not yet exceeded the $1,000,000 annual threshold and because ABM was released from further obligations under the Agreement upon CD1's early termination. (Doc. 10 at 6). Plaintiff's primary argument is that the lease contains a "latent" ambiguity as to whether ABM owes percentage rent upon early termination. (Doc. 12 at 11). According to Plaintiff, the

4

latent ambiguity is apparent based on the contract's requirement (and Defendant's custom) of tracking the accrual of percentage rent against a monthly $83,333.33 threshold. (Doc. 12 at 11). Based on this monthly tracking, Plaintiff asserts that Defendant owes CD1 accrued percentage rent in the amount of 85% of the difference between monthly gross receipts and an $83,333.33 monthly threshold, regardless of whether Defendant met the annual $1,000,000 threshold.

The parties agree that Ohio law governs the Court's interpretation of the Lease Agreement, pursuant to the Agreement's choice-of-law provision.[2] (Doc. 4 at 21 ¶ 30; Doc. 10 at 8; Doc. 12 at 8). Whether a contract is ambiguous is a matter of law for the court to decide, as is the interpretation of an unambiguous contract. *Broad St. Energy Co. v. Endeavor Ohio, LLC*, 975 F. Supp. 2d 878, 883-84 (S.D. Ohio 2013) (citing *Potti v. Duramed Pharms., Inc.*, 938 F.2d 641, 647 (6th Cir. 1991)). "When the language of a written contract is clear, a court may look no further than the writing itself to find the intent of the parties." *Sunoco, Inc. (R&M) v. Toledo Edison Co.*, 953 N.E.2d 285, 292 (Ohio 2011). Courts may examine extrinsic evidence to discern the parties' intent only when the contract is ambiguous, or "when the circumstances surrounding the agreement invest the language of the contract with a special meaning." *Shifrin v. Forest City Enters.*, 597 N.E.2d 499, 501 (Ohio 1992); *accord Lutz v. Chesapeake Appalachia, LLC*, 71 N.E.3d 1010, 1012 (Ohio 2016). Thus, in Ohio, courts generally cannot look to

---

[2] Courts sitting in diversity "generally enforce the parties' contractual choice of governing law." *Savedoff v. Access Grp., Inc.*, 524 F.3d 754, 762 (6th Cir. 2008); *see also Tele-Save Merch. Co. v. Consumers Distrib. Co., Ltd.*, 814 F.2d 1120, 1122 (6th Cir. 1987) ("Ohio choice-of-law principles strongly favor upholding the chosen law of the contracting parties.").

5

extrinsic evidence to find an ambiguity—rather, the ambiguity must be apparent on the face of the agreement. *Savedoff*, 524 F.3d at 763 (citing *Covington v. Lucia*, 784 N.E.2d 186, 190 (Ohio Ct. App. 2003)).

A contract is ambiguous when in cannot be given a "definite legal meaning," *Westfield Ins. Co. v. Galatis*, 797 N.E.2d 1256, 1261 (Ohio 2003), or "when a provision at issue is susceptible of more than one reasonable interpretation." *Lager v. Miller-Gonzalez*, 896 N.E.2d 666, 669 (Ohio 2008). When interpreting a contract, "the role of a court is to give effect to the intent of the parties" which is presumed to be "reflected in the language used." *Westfield*, 797 N.E.2d at 1261. Further, "a contract is to be read as a whole and the intent of each part gathered from a consideration of the whole." *Cincinnati Ins. Co. v. CPS Holdings, Inc.*, 875 N.E.2d 31 (Ohio 2007) (quoting *Foster Wheeler Enviresponse, Inc. v. Franklin Cty. Convention Facilities Auth.*, 678 N.E.2d 519, 526 (Ohio 1997)). Thus, a court's interpretation should attempt to harmonize all provisions of a contract, such that each provision is given effect, if possible. *Id.* at 35 (citing *Expanded Metal Fire-proofing Co. v. Noel Constr. Co.*, 101 N.E. 348, 350 (Ohio 1913)).

When an ambiguity presents, the extrinsic evidence considered can include "(1) the circumstances surrounding the parties at the time the contract was made, (2) the objectives the parties intended to accomplish by entering into the contract, and (3) any acts by the parties that demonstrate the construction they gave to their agreement." *Lutz*, 71 N.E.3d at 1012 (quoting *U.S. Fid. & Guar. Co. v. St. Elizabeth Med. Ctr.*, 716 N.E.2d 1201 (Ohio Ct. App. 1998)).

6

Although Plaintiff primarily argues that the contract contains a *latent* ambiguity with respect to percentage rent due upon early termination, the Court will first review the four corners of the contract to consider Plaintiff's alternative argument that the contract is ambiguous on its face. (*See* Doc. 12 at 13).

Section 3 of the Lease Agreement governs rent owed by ABM and provides as follows:

> (a) **Fixed Rent.** On or before the first day of each month during the Term of this lease, Lessee agrees to pay Lessor, in advance, a fixed monthly rent of Sixty Two Thousand Five Hundred and 00/100 Dollars ($62,500) (the "Base Rent"). <u>If the Lease termination date is not on the last day of a month, a prorated monthly installment of Base Rent shall be paid at the then current rate for the fractional month.</u>
>
> (b) **Percentage Rent.** Lessee shall pay as additional rent, if any, <u>eighty-five percent (85%) of the Gross Parking Receipts (defined below) derived from the Leased Premises in excess of One Million and 00/100 dollars ($1,000,000) during each Lease Year of the Term of this Lease (the "Percentage Rent"). Lessee shall deliver to Lessor any requirement [sic] payment of Percentage Rent within twenty (20) days after the expiration of each Lease Year.</u> Further, Lessee shall deliver to Lessor in accordance with the schedule set forth on Exhibit C, a statement of Lessee's Gross Parking Receipts (the "Sales Statement"). The Sales Statement shall be certified as being true and accurate to Lessor by an authorized officer of Lessee.
>
> "Gross Parking Receipts" as used herein shall mean all sums derived by Lessee from the parking and storage of motor vehicles upon the Leased Premises, whether on an hourly, daily, weekly, or monthly basis, less all: refunds, discounts, credit card fees, sales, use, excise, parking, or gross receipts taxes attributable to the use or occupancy of the Leased Premises, or taxes imposed on the parking spaces/stalls on or vehicles entering or using the Leased Premises.

(Doc. 4 at 14 ¶ 3(b)) (emphasis added). Further, Section 17 of the Agreement gave CD1 the right to terminate the contract early—without cause—with thirty days' notice:

> Notwithstanding anything to the contrary contained in this Lease, Lessor shall have the right to terminate this Lease at any time during the Term by delivering Lessee not less than thirty (30) days advance written notice (the "Termination Notice"). The Termination Notice shall specify the effective date of the Lease termination. <u>Upon cancellation or termination of this Lease, Lessee shall be released from any further obligation under the terms of this Lease arising after the date of such termination.</u>

(*Id.* at 19 ¶ 17) (emphasis added). In addition, the "Parking Operator Reporting Requirements" incorporated by reference in the Lease Agreement as "Exhibit C" required ABM to provide to CD1 a "Statement of Revenue and Expense Report including <u>monthly and YTD amounts</u>" and a "Sales Statement defined in Section 3(b)" <u>by the 20th of the month</u>. (*Id.* at 57) (emphasis added); *see KeyBank Nat'l Ass'n v. Columbus Campus, LLC*, 988 N.E.2d 32, 39 (Ohio Ct. App. 2013) ("[S]eparate agreements may be incorporated by reference into a signed contract."). Although Plaintiff asserts that the Court should consider the actual sales statements, including a sample from 2017-2018 attached to the Complaint, those statements, created after execution of the contract cannot properly be considered part of the initial agreement and are instead extrinsic evidence.

Upon review of the Agreement as a whole, it is clear that ABM does not owe CD1 accrued percentage rent as measured against an $83,333.33 monthly threshold. Plaintiff's interpretation—that percentage rent accrued on a monthly basis, such that the difference between monthly gross receipts and one-twelfth of the threshold ($83,333.33) was owed upon early termination, regardless of the $1,0000,000 annual threshold, is not reasonable on the face of the contract. The Agreement makes plain that percentage rent is limited to 85% of gross receipts collected for that year, *in excess of* $1,000,000. In addition, under the Agreement, if Plaintiff exercises its right to terminate the contract, Defendant is

8

released from further obligations under the Agreement arising after the termination.[3] Thus, based on the plain language of the contract, percentage rent is calculated on an annual basis against a $1,000,000 threshold—no amount of percentage rent is owed before gross recipts exceed that amount.

The requirement, built into the contract, that ABM *track and report* gross receipts on a *monthly* basis does not suggest an alternate interpretation. Accepting Plaintiff's position that upon early termination, ABM owes CD1 accrued percentage rent on a pro rata basis would require the Court to read out the $1,000,000 threshold. ABM was entitled to keep the first $1,000,000 in gross receipts (less fixed rent) regardless of when termination occurred.

As ABM points out, this interpretation is bolstered by the fact that the provision governing fixed rent expressly provides for prorated monthly fixed rent in the event of an early termination. (*See* Doc. 4 at 14 ¶ 3(a)). Applying the interpretative cannon of *expressio unius est exclusio alterius*, it can be inferred that the parties intentionally excluded a similar provision for prorated percentage rent. *See Broad St. Energy Co.*, 975 F. Supp. 2d at 890 (citing *State ex rel. Paluf v. Feneli*, 630 N.E.2d 708, 712 (Ohio 1994)).

Furthermore, a review of the sales statement does not reveal a "latent" ambiguity concerning whether ABM owes accrued percentage rent on monthly sales exceeding

---

[3] Plaintiff does not dispute that it terminated the contract under Section 17 of the lease, rather than Section 16, which allows either party to terminate the lease for cause after notice and an opportunity to remedy a perceived breach. (*See* Doc. 4 at 3 ¶¶ 12, 17; Doc. 12 at 14). This is significant, because termination for cause under Section 16 would not have released ABM from further obligations under the lease.

$83,333.33 for the shortened lease year. The sales statement does not demonstrate an ambiguity, nor does it support Plaintiff's interpretation of the Agreement. As noted above, courts are not generally permitted to consider extrinsic evidence in order to discover an ambiguity. At the same time, Ohio courts have recognized latent, as well as patent, ambiguities. A latent ambiguity is one that is not apparent based on the face of a contract. *Conkle v. Conkle*, 285 N.E.2d 883, 887-88 (Ohio Ct. App. 1972). Instead, a latent ambiguity "arises when language is clear and intelligible and suggests but a single meaning, but some intrinsic fact or some extraneous evidence creates a necessity for interpretation or a choice between two or more possible meanings . . . ." *Id.* at 888. This concept often arises in the context of wills, such as in *Conkle*, where the will at issue clearly stated that a gift was to be given to the testator's grandchildren, an issue that became ambiguous only when considering the fact that some of the grandchildren had been adopted. *See Violante v. Vill. of Brady Lake*, No. 2012-P-0054, 2012 WL 6738488, at *8 (Ohio Ct. App. Dec. 31, 2012) (citing *Conkle*, 285 N.E.2d at 888); *Radzisewski v. Szymanczak*, No. 98895, 2012 WL 2150898, at *4 (Ohio Ct. App. June 14, 2012); *see also Thomasville Furniture Indus. v. Elder-Beerman Stores*, 250 B.R. 609, 634-36 (S.D. Ohio 1998) (interpreting an agreed order).

Here, Plaintiff asserts that ABM's sales statement, which shows that it *tracked* the accrual of percentage rent each month against an $83,333.33 threshold, creates an ambiguity as to whether, upon early termination, CD1 is entitled to percentage rent calculated on a monthly basis. (Doc. 12 at 11). The sales statement from 2017-2018 contains the following chart:

|  |  | Gross Revenue | 1,000,000.00 Less Base | Difference | 85.00% | Cumulative |
|---|---|---|---|---|---|---|
| September | 2017 | 151,006.32 | 83,333.33 | 67,672.99 | 57,522.04 | 57,522.04 |
| October | 2017 | 142,192.69 | 83,333.33 | 58,859.36 | 50,030.45 | 107,552.49 |
| November | 2017 | 128,782.68 | 83,333.33 | 45,449.35 | 38,631.94 | 146,184.44 |
| December | 2017 | 135,750.14 | 83,333.33 | 52,416.81 | 44,554.29 | 190,738.72 |
| January | 2018 | 136,840.05 | 83,333.33 | 53,506.72 | 45,480.71 | 236,219.43 |
| February | 2018 | 149,122.04 | 83,333.33 | 65,788.71 | 55,920.40 | 292,139.83 |
| March | 2018 | 159,575.49 | 83,333.33 | 76,242.16 | 64,805.83 | 356,945.67 |
| April | 2018 | 154,417.13 | 83,333.33 | 71,083.80 | 60,421.23 | 417,366.89 |
| May | 2018 | 168,094.35 | 83,333.33 | 84,761.02 | 72,046.86 | 489,413.76 |
| June | 2018 | 139,535.27 | 83,333.33 | 56,201.94 | 47,771.65 | 537,185.40 |
| July | 2018 | 134,524.57 | 83,333.33 | 51,191.24 | 43,512.55 | 580,697.95 |
| August | 2018 | 156,787.27 | 83,333.33 | 73,453.94 | 62,435.85 | 643,133.80 |
|  |  | 1,756,628.00 | 1,000,000.00 | 756,628.00 | 643,133.80 |  |

(Doc. 4 at 58). Plaintiff's argument is meritless. The sales statement shows, as the contract expressly requires, that ABM tracked its gross receipts on a monthly basis. This is entirely consistent with the Agreement's $1,000,000 threshold. In fact, at the top of the column subtracting $83,333.33 each month, is a notation referencing the $1,000,000 annual threshold. In short, the sales statement and ABM's practice of monthly tracking are consistent with the Agreement's $1,000,000 threshold and do not reveal a lack of clarity as to whether that threshold must be met prior to ABM owing any amount of additional percentage rent upon early termination. Again, accepting Plaintiff's interpretation would require the Court to ignore the $1,000,000 threshold that is plainly provided for in the Agreement and that is not a plausible interpretation of the contract.

Plaintiff's alternative argument that the Agreement is silent, as opposed to ambiguous, regarding whether percentage rent was calculated and owing on a monthly basis also fails. (Doc. 12 at 18). "The fact that a contract [ ] is silent on a particular point does not make it ambiguous." *Savedoff*, 524 F.3d at 764 (quoting *Statler Arms, Inc. v. APCOA, Inc.*, 700 N.E.2d 415, 421 (Cuyahoga Cty. Ct. Common Pleas 1997)).

Generally, "silence on a particular point or the total absence of a provision from a contract [ ] is evidence of an intention of the parties to exclude this item from the contract [ ], rather than evidence of an intention to include it." *Statler Arms*, 700 N.E.2d at 421. Nevertheless, courts have also found that when a contract is silent on a particular point, the parties "are required to use good faith to fill the gap . . . ." *Savedoff*, 524 F.3d at 764 (quoting *Burlington Res. Oil & Gas Co. v. Cox*, 729 N.E.2d 398, 401 (Ohio Ct. App. 1999)). It is up to the fact-finder to determine whether a party acted in good faith in light of the silence of the contract. *Id.* (citing *Ed Schory & Sons v. Francis*, 662 N.E.2d 1074, 1082-83 (Ohio 1996) (in this context, "good faith" refers to "an implied undertaking not to take opportunistic advantage in a way that could not have been contemplated at the time of drafting")).

While CD1 argues that the Agreement is silent as to whether percentage rent is owed upon early termination, the Court disagrees. This is not a case where circumstances arise that were not foreseen by the parties when they initially entered into the contract. The Agreement expressly provides CD1 (only) the opportunity to terminate the contract early (without cause), releasing ABM from further obligations under the contract. In addition, as noted above, the Agreement provides for prorated *fixed* rent upon early termination but does not include a similar provision with respect to *percentage* rent. Thus, Plaintiff is asking the Court to add in a provision affording CD1 accrued percentage rent, *regardless of whether ABM had met the $1,000,000 threshold*, following its early termination, when the language of the contract evinces the parties' clear intent to avoid this result. *See Fifth Third Mortg. Co. v. Chicago Title Ins. Co.*, 692 F.3d 507,

512-13 (6th Cir. 2012) (declining request to "add [ ] to the contract a substantive provision not included by the parties."); *see also Fulz & Thatcher v. Burrows Grp. Corp.*, No. CA2005-11-126, 2006 WL 3833971, at *6 (Ohio Ct. App. Dec. 28, 2006) (the good faith requirement "is not an invitation to the court to decide whether one party ought to have exercised privileges expressly reserved in the document").

Finally, Plaintiff claims that circumstances surrounding the Agreement imbue the percentage rent provision with a "special meaning." (Doc. 12 at 12). Courts in Ohio have found that "when the circumstances surrounding the agreement invest the language of the contract with a special meaning," courts may consider extrinsic evidence. *Shifrin*, 597 N.E.2d at 501; *accord Lutz*, 71 N.E.3d at 1012. Plaintiff's argument here is that the relationship between ABM and CD1 resembles that of a property management company, such that ABM was hired to maintain the parking garage and collect sales for CD1. (Doc. 12 at 12). Accordingly, Plaintiff asserts that it would be absurd to interpret the Agreement not to require ABM to pay percentage rent accruing on a monthly basis, amounting to a "windfall" to ABM upon early termination. (*Id.* at 12-13).

Yet, as previously established, the Agreement expressly permits ABM to keep the first $1,000,000 collected in gross receipts, owing Plaintiff 85% on any amount of receipts collected *over that annual threshold*. The nature of the parties' business relationship does not explain why, upon early termination, the Court should ignore that threshold. Such an interpretation does not reflect the structure of the relationship, as it was established by the express language of the Agreement. Similarly, Plaintiff's assertion that permitting ABM to keep gross receipts exceeding an $83,333.33 monthly

threshold would amount to a forfeiture or penalty is not persuasive—ABM did not owe percentage rent on the first $1,000,000 collected. *See Hope Acad. Broadway Campus v. White Hat Mgmt., LLC*, 46 N.E.3d 665, 675 (Ohio 2015) (citing *Ohio Crane Co. v. Hicks*, 143 N.E. 388, 389 (Ohio 1924) ("A contract does not become ambiguous because its operation may work a hardship upon one party.")).

The only interpretation of the Agreement that CD1 advocates for would require ABM to pay accrued percentage rent as measured against an $83,333.33 monthly threshold. Because Plaintiff's interpretation is unreasonable and contrary to the plain language of the Agreement, the Court cannot grant Plaintiff's motion for judgment on the pleadings. The Court agrees with Defendant's assessment that the question before the Court is limited to whether ABM owes CD1 accrued percentage rent as measured against a monthly $83,333.33 threshold. The answer to that question is "no."

The Declaratory Judgment Act provides that "[i]n a case of actual controversy within its jurisdiction, . . . any court . . . may declare the rights and other legal relations of any interested party . . . ." 28 U.S.C. § 2201(a). The Act does not alter the preexisting case-or-controversy requirement of Article III of the Constitution, which "allows federal courts to deliver judgments on real disputes, not hypothetical ones, [and] to resolve concrete disputes, not pronounce judgments on theoretical disputes that may or may not materialize . . . ." *Saginaw Cty. v. STAT Emergency Med. Servs.*, 946 F.3d 951, 954 (6th Cir. 2020); *see also City of Parma v. Cingular Wireless, LLC*, 278 F. App'x 636, 641 (6th Cir. 2008) ("Ohio law permits individuals to pursue declaratory judgments, *see* Ohio Rev. Code § 2721.01, *et seq.*, for purposes that include the determination of 'questions of

14

construction' under a contract. A declaratory judgment in federal court must still present a justiciable controversy.") (internal citation omitted).

Plaintiff has not asked the Court to declare whether ABM owes percentage rent on any amount of gross receipts collected *over* the $1,000,000 threshold for the shortened 2018-2019 lease year. That is likely because, by Plaintiff's own estimation, Defendant did not exceed that threshold by the time Plaintiff terminated the Agreement in February 2019. Deciding that question in a vacuum and prior to Plaintiff bringing that theory before the Court would be an improper exercise of this Court's discretion under the Declaratory Judgment Act.

Plaintiff's breach of contract claim (Count 2) seeking $277,814.87 in percentage rent relies on a finding that percentage rent accrued on a monthly basis. Because that is not the case, that aspect of Plaintiff's breach of contract claim fails as a matter of law. To the extent Plaintiff asserts that ABM breached the Agreement by failing to certify sales statements by an authorized ABM officer, that portion of the breach of contract claim survives. (Doc. 4 at 7 ¶ 52). Plaintiff's "action on account" claim (Count 1) also depends on a finding that ABM owed percentage rent on sales exceeding $83,333.33 each month, and therefore fails as a matter of law.

Further, Plaintiff's unjust enrichment and equitable disgorgement claim (Count 5) fails, in part, as a matter of law, as "[u]njust enrichment is an equitable doctrine to justify a quasi-contractual remedy *that operates in the absence of an express contract . . . .*" *Wulinger v. Mfrs. Life Ins. Co.*, 567 F.3d 787, 799 (6th Cir. 2009) (emphasis in original); *see id.* ("Ohio law is clear that a plaintiff may not recover under the theory of unjust

enrichment or quasi-contract when an express contract covers the same subject.") (quoting *Lehmkuhl v. ECR Corp.*, No. 06 CA 039, 2008 WL 5104747, at *5 (Ohio Ct. App. Dec. 2, 2008)). To the extent Plaintiff alleges that ABM was unjustly enriched by retaining percentage rent, that claims fails, because percentage rent is a subject expressly covered by the contact.[4] However, Plaintiff also alleges that ABM "entered into arrangements with third parties not governed by the Lease Agreement and has collected and retained unreported revenue therefrom." (Doc. 4 ¶ 77). Because Defendant only sought dismissal of Plaintiff's unjust enrichment claim on the basis that the contract covers percentage rent, Plaintiff's claim for unjust enrichment (Count 5) may proceed with respect to Plaintiff's allegations that ABM entered into improper relationships with third parties. (*See* Doc. 10 at 18).

Plaintiff's claim for an accounting (Count 4) may also proceed, as it is not specifically tied to a finding that ABM owes percentage rent on gross receipts exceeding $83,333.33 each month.

## IV. CONCLUSION

Based upon the foregoing,

1) Defendant's motion for partial judgment on the pleadings (Doc. 10) is **GRANTED** as follows:

   a. Plaintiff's request for declaratory judgment (Count 3) is **DISMISSED**;

   b. Plaintiff's request for action on account (Count 1) is **DISMISSED**;

---

[4] The parties do not dispute the validity of the contract. (*See* Doc. 10 at 5).

16

      c.      Plaintiff's breach of contract claim (Count 2) is **DISMISSED** with the exception of Plaintiff's claim that Defendant breached the Agreement by failing to certify sales statements, which may proceed;

      d.      Plaintiff's unjust enrichment and equitable disgorgement claim (Count 5) is **DISMISSED** with the exception of Plaintiff's claim that Defendant entered into improper relationships with third parties, which may proceed;

      e.      Plaintiff's request for an accounting (Count 4) may proceed.

2)    Plaintiff's cross-motion for partial judgment on the pleadings with respect to its request for declaratory judgment (Doc. 12) is **DENIED**.

**IT IS SO ORDERED.**

Date:   2/19/2020                                              *s/Timothy S. Black*
                                                                 Timothy S. Black
                                                                 United States District Judge